IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  12-cv-02823-LTB

MARTIN MENDEZ,

              Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

              Defendant.

_____

ORDER

_____

Plaintiff, Martin Mendez, appeals from the Social Security Administration

Commissioner's (the "Commissioner") final decision denying his application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), filed pursuant to Titles

II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-433, 1381-1383c.

Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral argument will not materially aid in

resolving this appeal.  After considering the parties' arguments and the administrative record, for

the reasons below, I affirm the Commissioner's final order**.**

## I.  STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying his July 1, 2009

application for SSI and DIB.  [Administrative Record ("AR") Doc. # 12-5, p. 2].  His application

was initially denied at the administrative level.  [*Id.* at 12-3, 2-3].  An Administrative Law Judge

("ALJ") subsequently conducted a hearing on March 29, 2011 (*id.* at 12-2, 34-62), and issued a

written ruling on May 24, 2011.  (*Id.* at 18-32).  The ALJ denied Plaintiff's application on the

basis that he was not disabled during the relevant time period because he could perform work in

the national economy given his residual functional capacity ("RFC"), age, education, and work experience.  [*Id.*]  Plaintiff appealed the denial of his application to the Social Security Administration Appeals Council ("Appeals Council").  [*Id.* at 12-4, 58].  On December 30, 2011, the Appeals Council declined to review the decision of the ALJ, making the denial final for the purpose of judicial review.  [*Id.* at 12-2, 12-17].  In denying review, the Appeals Council informed Plaintiff that it "considered the reasons [Plaintiff] disagree[d] with the decision in the material listed on the enclosed Order of Appeals Council.  [It] found this information does not provide a basis for changing the Administrative Law Judge's decision."  [*Id.* at 12-13].

 Plaintiff timely filed his Complaint with this Court seeking review of the Commissioner's final decision.  [Doc. # 1].

## II.  FACTS

The facts are largely undisputed and extensively provided in the ALJ's order.  As such, I provide a limited factual background as relevant here.

Plaintiff was born on March 27, 1960, was 49 years old on his alleged amended onset date of June 19, 2009, and was 51 at the time of the ALJ's decision.  [AR Doc. # 12-2, 37].  He graduated from high school and his past relevant work history consists of work for fifteen years as a commercial heating and air conditioning ("HVAC") general foreman and installer.  [*Id.* at 45-47 & 12-6, 4].  In 2009, 2010, and 2011, Plaintiff was unemployed and received unemployment benefits.  [*Id.* at 12-2, 38-39].  Pursuant to 20 C.F.R. § 404.130, in order to be eligible for benefits, Plaintiff must prove that his disability began before the date through which he remained insured, which in this case was December 31, 2013.  [*Id.* at 12-2, 21].  Thus here, the relevant time period for determining disability is June 19, 2009 through the date of the ALJ's

decision, May 24, 2011.  [*See id.*]; 20 C.F.R. § 404.130.

During the relevant time period Plaintiff was not engaged in substantial gainful activity, but as noted above, he did collect unemployment benefits.  [*Id.* at 12-2, 23].  From April 15, 2008 to February 19, 2009, Plaintiff visited his primary care physician, Dr. Teresa L. Jarmul six times.  [*Id.* at 12-7, 2-46].  In November 2008, Plaintiff weighed approximately 260 pounds.  [*Id.*]  Dr. Jarmul diagnosed Plaintiff with gout and mild hypothyroidism.  [*Id.* at 25-27, 31-32].He suffered from a single, acute gout flare in late January/early February, 2009. [*Id.* at 5-6].  By the end of February 2009, Plaintiff reported that all apparent gout and hypothyroid issues had been resolved.  [*Id.*]  Plaintiff's last appointment with Dr. Jarmul was February 19, 2009.  [*Id.*]

In late 2009 Plaintiff was diagnosed with Diabetes Mellitus, and in January of 2010, Plaintiff began treatment at Southern Colorado Family Medicine ("SCFM").  [*Id.* at 91].  Throughout his visits to SCFM Plaintiff maintained a weight of approximately 215 pounds, and throughout his treatment he consistently worked with staff at SCFM to control his Diabetes Mellitus symptoms.  [*Id.* at 72-87].  SCFM's treatment records consistently discuss Plaintiff's health, exercise habits including weight lifting and riding an exercise bicycle, and that Plaintiff was "overall feeling good."  [*See, e.g., id.* at 92, 97, 99, 100].  During this time Plaintiff was described as "a highly motivated individual who has changed his diet radically, started losing weight, [and] exercising significantly."  [*Id.* at 12-7, 84].  SCFM's treatment records also note Plaintiff's complaints of foot and knee pain, which were diagnosed as Osteoarthritis and diabetic neuropathy.  [*Id.* at 87-105].  Plaintiff was given medications to treat these conditions including mild pain medication and a steroid injection.  [*Id.*]  After the injection, Plaintiff reported feeling better and declined a prescribed MRI.  [*Id.*]

### III.  LAW

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382.  Additionally, SSI requires that an individual meet income, resource, and other relevant requirements.  *See* 42 U.S.C. § 1382.  A Five-Step sequential evaluation process is used to determine whether a claimant is disabled under the SSA, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137 (1987).

Step One asks whether the claimant is presently engaged in substantial gainful activity. If he is, benefits are denied.  *See* 20 C.F.R. § 404.1520.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments, as governed by 20 C.F.R. § 404.1520(c).  If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible.  *See* 20 C.F.R. § 404.1520(c).  Step Three then assesses whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. § 404.1520(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that his impairment(s) and assessed RFC prevent him from performing work that he has performed in the past.  If the claimant is able to perform his previous work, he is not disabled.  *See* 20 C.F.R. §§ 404.1520(e),

(f). Finally, if the claimant establishes a *prima facie* case of disability based on the previous four steps, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. § 404.1520(g).

## IV.  ALJ's RULING

The ALJ found that Plaintiff had met the insured requirements of the SSA through December 31, 2013. [AR Doc. # 12-2, 21]. She ruled that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date of June 19, 2009, through the date of the ALJ's decision, May 24, 2011. [*Id*. at 23]. The ALJ found that through the date of her decision the Plaintiff had the following sufficiently severe impairments: "osteoarthritis bilateral knees; gout; and diabetes mellitus with neuropathy" (Step Two). [*Id*. at 24]. However, the ALJ then determined that Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled one of the listed impairments (Step Three) in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). [*Id*. at 24]. Because the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment, she then assessed Plaintiff's RFC. [*Id*. at 24-26].

The ALJ evaluated the evidence, and found that through the date last insured Plaintiff had the RFC to perform work light work as defined in 20 C.F.R. § 404.1567(b), with the following limitations:

> [Plaintiff] could lift or carry ten pounds frequently and twenty pounds occasionally; could stand and/or walk, with normal breaks, for a total of two hours in an eight hour workday; could sit, with normal breaks, for a total of six hours in an eight hour workday; could perform pushing and pulling motions with

> his bilateral upper extremities within the aforementioned weight restrictions but
> should avoid pushing and pulling with his bilateral lower extremities; should
> avoid unprotected heights and moving machinery; could occasionally perform the
> postural activities of climbing, stooping, crouching, kneeling, and crawling;
> should not climb ladders, ropes or scaffolds and should avoid repetitive bending
> and squatting.

[*Id.* at 24].  As a result of Plaintiff's RFC assessment, the ALJ found that Plaintiff was not able

to perform any of his past relevant work (Step 4).  [*Id.* at 26-27].  Because the ALJ concluded at

Step Four that Plaintiff was unable to perform any past relevant work, the ALJ continued to Step

Five, and under that Step concluded that there were other jobs existing in the national economy

Plaintiff was able to perform.  [*Id.* at 27-28].  Consequently, the ALJ concluded that Plaintiff was

not disabled between his alleged onset date and the date last insured.  [*Id.* at 28].

## V.  STANDARD OF REVIEW

I review the Commissioner's decision (expressed here as the ruling of the ALJ) "to

determine whether the factual findings are supported by substantial evidence in light of the entire

record and to determine whether the correct legal standards were applied."  *Williamson v.

Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003).  My review of the factual findings is to

determine whether they, "are based upon substantial evidence, and inferences reasonably drawn

therefrom.  If they are so supported, they are conclusive upon the reviewing court and may not

be disturbed."  *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial

evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) (quotations omitted).  It

requires "more than a scintilla but less than a preponderance."  *Zoltanski v. F.A.A.*, 372 F.3d

1195, 1200 (10th Cir. 2004).

## VI.  APPEAL

Plaintiff challenges the ALJ's determinations on four grounds.  First, Plaintiff contends that the ALJ erred in her RFC analysis.  Second, Plaintiff challenges the ALJ's determination of Plaintiff's credibility.  Third, Plaintiff contends that the ALJ's Step Four evaluation of Plaintiff's treating physician, Dr. Teresa L. Jarmul, was improper.  Fourth, Plaintiff challenges the ALJ's Step Five determination that Plaintiff could perform other jobs existing in the national economy. I address each of Plaintiff's arguments in turn below.

**A.**     **ALJ's RFC Assessment & Assessment of Plaintiff's Credibility**

Plaintiff first challenges the ALJ's assessed RFC.  Specifically, he argues that the ALJ improperly evaluated his fatigue, pain, and obesity.  I disagree.

An "RFC is what an individual can still do despite his or her limitations."  SSR 96-8p.  It "is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  *Id.*  When making findings concerning a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  *Id.*

Once a claimant has established a medically determinable impairment that could reasonably be expected to cause his symptoms, including pain, an ALJ is to "consider all of the available evidence, including [the claimant's medical] history, the [medical] signs and laboratory findings, and statements [] about how [the claimant's] symptoms affect [him]."  20 C.F.R. §

7

404.1529(a).  Insodoing, the adjudicator must make a finding about the credibility of the claimant's statements about his symptoms and their functional effects.  *See* SSR 96-7p; *accord* 20 C.F.R. § 404.1529(a) ("We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.").  "Credibility determinations are peculiarly the province of the finder of fact," and I "will not upset such determinations when supported by substantial evidence." *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002) (*quoting Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995)). Credibility findings should nevertheless be "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* (*quoting Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).

I discuss here the ALJ's credibility determination, as the RFC, including the three specific areas Plaintiff raises, is suffused with it.  The ALJ found Plaintiff's reports of pain, limitations, and their functional effects "inconsistent with the above residual functional capacity assessment and therefore not credible."  [AR Doc. # 12-2, 25].  She began her RFC evaluation by stating that "[i]n making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [t]he undersigned has also considered opinion evidence."  [*Id.*]  Further, the ALJ provided that she considered Plaintiff's statements "concerning the intensity, persistence and limiting effects of [his] symptoms."  [*Id.*]

The ultimate credibility determination was a corollary from the two findings that "the degree of limitation asserted by [Plaintiff] was simply not corroborated by the objective

evidence," and that Plaintiff's statements were inconsistent with the record as a whole, and thus not credible. [*Id.*]  The ALJ set forth specific evidence supporting this credibility assessment. [*See id.* at 24-26].  These included the following: Plaintiff applied for unemployment benefits soon after his alleged onset date, thereby representing that he was capable of full time employment, and collected them until about two weeks prior to the hearing.  [*Id.* at 23].  At the hearing on March 29, 2011, Plaintiff told the ALJ that he could not stand for more than 5-10 minutes and could not walk more than a single city block.  [*Id.* at 12-2, 39-40].  Yet the record does not support that assertion: in late 2010 the Plaintiff reported to his doctors that he had been using an exercise bicycle, lifting weights, and was "overall feeling good."  [Doc. # 12-7, 92-105].

The ALJ also noted the inconsistency between Plaintiff's hearing testimony regarding his gout, in which he claimed to have gout "flare-ups" approximately every two to three months (*id.* at 51), and the medical records which "noted no episodes of flares after the amended alleged onset date or use of gout medications."  [*Id.* at 25].  Similarly, Plaintiff reported pain in his legs and feet, but his physical examinations "revealed normal reflexes and gait."  [*Id.*]  Additionally, the ALJ pointed out that Plaintiff made no complaints related to obesity to support his claim of disability, and instead Plaintiff's "medical care providers observed that he was a motivated individual who, through diet and exercise, lost a significant amount of weight following his diagnosis with diabetes mellitus." [*Id.* at 26].  Lastly, the ALJ pointed out that both Plaintiff's diabetes mellitus and osteoarthritis have been well-controlled through minimal medication.  [*Id.* at 25-26].

These are all valid reasons for discounting a claimant's credibility.  An ALJ may discount a claimant's testimony when the claimant's daily activities, other past behaviors, or behavior at the hearing are incongruous with a disabling impairment or his asserted symptoms. *See, e.g.*, *White v. Barnhart,* 287 F.3d 903, 909 (10th Cir. 2001) (holding that the ALJ's credibility determination was proper where "the ALJ carefully set forth the reasons supporting his negative credibility assessment.  Chief among them, he made clear, were his own observations of Ms. White . . . He also based his judgment on his review of the medical records as well as Ms. White's own account of her daily activities, finding both to be inconsistent with her complaints of disabling pain.")

The evidence  above weighs more than a scintilla, making it substantial.  *See Trujillo*, 429 F.2d at 1150.  I will therefore not disturb the credibility determination.  *See McGoffin*, 288 F.3d at 1254; *see also Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000) (explaining that an ALJ's credibility evaluation complies with law "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility").  I now turn to Plaintiff's three specific complaints about the RFC.

1. **Fatigue**

Plaintiff's first claim of error is that the ALJ failed to incorporate the fatigue he alleged resulted from his condition.  An ALJ's credibility determinations are entitled to substantial deference.  However, a credibility determination must have support in the record.  Thus, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Brown*, 838 F.2d 1125, 1133 (10th Cir. 1988) (internal citations omitted).  Likewise, the ALJ must consider "subjective []

10

testimony, and expressly reflect that consideration in the findings." *Id*. The ALJ may consider, among other things, the objective medical evidence, the claimant's treatment and medication history, measures the claimant has taken to alleviate his symptoms, his work history, his daily activities and, of course, the claimant's statements about his impairments, and the effect of these things on his capacity to perform work. *See* generally 20 C.F.R. 404.1529(c).

Plaintiff testified at the hearing that he was suffering fatigue symptoms, explaining that he did not get enough sleep to "feel well" and that he had "a lot of fatigue." [AR Doc. # 12-2, 53-54]. In a Personal Pain Questionnaire Plaintiff also provided that a side effect of the medication he was taking was "fatigue, muscle aches, shortness of breath." [*Id*. at 12-6, 28]. However, Plaintiff did not complain of fatigue in his application for benefits. [*Id*. at 12-5 2-34]. Additionally, as discussed below, the ALJ considered the proper factors when evaluating Plaintiff's symptoms, and the RFC accounted for those she deemed credible. The ALJ stated that "[a]fter thorough review of the medical evidence, the undersigned found that the degree of limitation asserted by the claimant was simply not corroborated by the objective evidence." [*Id*. at 12-2, 26]. Specifically, her finding was well supported by: the few and limited complaints of fatigue reported by any of Plaintiff's treating sources; the several times Plaintiff indicated to his treating physicians that he had no side effects from his medications; and the evidence Plaintiff gave that exaggerated or magnified the facts and his symptoms. [*See id*. at 12-2, 24-26, & 12-7, 2-105].

Plaintiff argues that Dr. Jarmul's Functional Capacity Questionnaire identifies "Impaired Sleep" as one of Plaintiff's symptoms, however, as discussed below, the ALJ correctly gave Dr. Jarmul's Questionnaire little weight. Plaintiff also attempts to argue that "[t]he diagnosis of

'sleep apnea' appears in the record six times." [Doc. # 19, p.17].  However, as the Commissioner correctly points out, "Plaintiff cites to the portion of treatment notes documenting Plaintiff's past medical history, and on each occasion the treatment notes indicate that Plaintiff 'denies' sleep apnea." [Doc. # 20, p. 13].  Additionally, in those same treatment notes, Plaintiff reports increased energy in several occasions.  [*See, e.g.,* AR Doc. # 12-7, 80-81, 92].

In my review, I do not reweigh this evidence or substitute my judgment for the Commissioner's.  *Hackett*, 395 F.3d at 1172.  Instead I "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases" and ensure the ALJ's conclusions are supported by substantial evidence.  *Id.* (internal citations and quotations omitted).  To make his determination, the ALJ reviewed the purported symptoms and side-effects, the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, the medical record including, and opinion evidence.  [*See* AR Doc. # 12-2, 24-26].  She also adjudged the credibility of Plaintiff's statements and her decision included a narrative discussion describing why she found Plaintiff's testimony not credible.  The ALJ thus comported with the rules of law prescribed to make this evaluation.  *See* SSR 96-8p; *see also* 20 C.F.R. § 404.1529(a), (c).  Furthermore, the ALJ does not have the burden of *disproving* Plaintiff's side-effects.  *See White*, 287 F.3d at 905. The burden falls on Plaintiff to prove them.  *Id.*  I conclude that the evidence supporting the ALJ's conclusion on this point is supported by more than a scintilla of evidence and is thus not in error.

## 2.     Pain

Plaintiff argues that the ALJ failed to adequately discuss the effects of Plaintiff's pain. [*See* Doc. # 19, pp. 19-21].  I disagree.

The Tenth Circuit has recognized numerous factors in addition to medical test results that agency decision makers should consider when determining the credibility of subjective complaints of pain. *See Luna v. Bowen*, 834 F.2d 161, 165-66 (10th Cir. 1987). These include, "a claimant's persistent attempts to find relief for his pain and his willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor, . . . the claimant's daily activities, and the dosage, effectiveness, and side effects of medication." *Id.* (internal citations omitted). Nevertheless, the regulations prescribe that the ALJ must "consider all of the available evidence" in evaluating the claimant's reported pain. 20 C.F.R. § 404.1529(a), (c)(1).

Here, the ALJ considered the proper factors when evaluating Plaintiff's reports of pain, and the RFC accounted for those she deemed credible. She broadly stated that "[a]fter thorough review of the medical evidence, the undersigned found that the degree of limitation asserted by the claimant was simply not corroborated by the objective evidence." [AR Doc. # 12-2, 26]. More granularly, she expressly considered the *Luna* factors. [*See id.* at 25 (noting the absence of reports of problems related to Plaintiff's gout including any reports of flares or acute treatment); *Id.* at 25-26 (discussing the limited medications used to treat Plaintiff's reports of pain related to neuropathy and osteoarthritis including gabapentin, amitryptiline, ibuprofen and two knee injections); *Id.* (discussing Plaintiff's everyday activities including weight lifting and use of an exercise bicycle); *Id.* (noting the lack of reference to Plaintiff's use of a cane in his medical records)]. The ALJ also reasoned that "[a]fter the second injection, [Plaintiff] was also referred for a magnetic resonance imaging (MRI) scan of his knees but did not have the prescribed MRIs performed because he was 'feeling better.'" [*Id*. at 26].

13

The RFC reflects that the ALJ discounted much of Plaintiff's subjective reports of pain because she found them "not credible" for the reasons presented above.  Thus, the record contains more than a scintilla of evidence supporting the RFC's inclusion of certain pain complaints, and the exclusion of others, based on the ALJ's credibility determination.  That evaluation is thus not in error.  *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1500 (10th Cir. 1992) (explaining that I do not reweigh the evidence or substitute my judgment for the Commissioner's).

### 3.    Obesity

Lastly, Plaintiff argues that the ALJ did not properly consider the impact of Plaintiff's obesity on his other impairments.  While obesity and its effects must be considered when evaluating a claimants's RFC (*see* SSR 02-1p (instructing adjudicators to consider the effects of obesity when assessing an individual's RFC)), such consideration is only appropriate after a claimant has proven the existence of a medically severe impairment or combination of impairments, as governed by 20 C.F.R. § 404.1520(c) (Step Two).  If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible.  *See* 20 C.F.R. § 404.1520(c).

Here, the ALJ reviewed the evidence pertaining to Plaintiff's obesity and found only "mild degenerative changes."  [AR Doc. # 12-2, 24].  The ALJ noted that Plaintiff's "treatment records were absent any complaints or treatment for back pain and [his obesity has] not resulted in any vocationally relevant limitations." [*Id.*]  The ALJ reasoned that Plaintiff failed to prove that his obesity would have more than a minimal effect on his ability to do basic work activities. [*Id.*]  As a result, the ALJ concluded that Plaintiff's obesity "could not be considered [a] severe

impairment[]," and further examination of such was not required.  Thus, as mandated by 20

C.F.R. § 404.1520(c), the ALJ's evaluation was appropriate.  Additionally, it should be noted

that beginning in early 2010, his SCFM treatment records did not describe Plaintiff as obese, but

instead described Plaintiff as six feet tall and approximately 215 pounds.   [*See id.* at 78-105].

Accordingly, I find that the ALJ's RFC and determination of Plaintiff's credibility is

supported by substantial evidence and is thus not in error.

### B.     ALJ's Evaluation of Treating Physician's Opinion

Plaintiff argues that the opinion of his treating physician, Dr. Teresa L. Jarmul, was well

supported by the evidence, not contradicted by any other medical evidence, and thus should have

been given controlling weight.  For the reasons below, I disagree.

The parties do not dispute that Dr. Jarmul was a treating source.  According to the

"treating physician rule," the Commissioner will generally "give more weight to medical

opinions from treating sources than those from non-treating sources."  *Langley v. Barnhart*, 373

F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F .R. § 404.1527(c)(2).  In fact, "[a] treating

physician's opinion must be given substantial weight unless good cause is shown to disregard

it."  *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995).  A

treating physician's opinion is accorded this weight because of the unique perspective they have

to the medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th

Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must

complete a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638

F.3d 1324, 1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is

conclusive– that is, whether it is to be accorded "controlling weight" on the matter to which it

relates.  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at

1330.  To do so, the ALJ:

> [M]ust first consider whether the opinion is well-supported by medically
> acceptable clinical and laboratory diagnostic techniques. If the answer to this
> question is 'no,' then the inquiry at this stage is complete. If the ALJ finds that the
> opinion is well-supported, he must then confirm that the opinion is consistent
> with other substantial evidence in the record. [ . . . ] [I]f the opinion is deficient in
> either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F3d at 1300 (*applying* SSR 96-2p, 1996 WL 374188, at *2) (internal quotation

marks and citations omitted); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ

must proceed to the next step because, "[t]reating source medical opinions are still entitled to

deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."

*Watkins*, 350 F3d at 1300.  At Step Two, "the ALJ must make clear how much weight the

opinion is being given (including whether it is being rejected outright) and give good reasons,

tied to the factors specified in the cited regulations for this particular purpose, for the weight

assigned."  *Krauser*, 638 F.3d at 1330.  If this is not done, remand is mandatory.  *Id.*  As SSR 96-

2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion
> is not well-supported by medically acceptable clinical and laboratory diagnostic
> techniques or is inconsistent with the other substantial evidence in the case record
> means only that the opinion is not entitled to "controlling weight," not that the
> opinion should be rejected.  Treating source medical opinions are still entitled to
> deference and must be weighed using all of the factors provided in [§§ ] 404.1527
> and 416.927.  In many cases, a treating source's medical opinion will be entitled
> to the greatest weight and should be adopted, even if it does not meet the test for

controlling weight.

*Id.* (*citing* SSR 96-2p, 1996 WL 374188, at *4) (emphasis added).  Hence, the absence of a

condition for controlling weight raises, but does not resolve the second, distinct question of how

much weight to give the opinion.  *Id.* at 1330-31 (*citing Langley*, 373 F.3d at 1120) (holding that

while absence of objective testing provided basis for denying controlling weight to treating

physician's opinion, "[t]he ALJ was not entitled, however, to completely reject [it] on this

basis")).  In weighing the opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2)
> the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to
> which the physician's opinion is supported by relevant evidence; (4) consistency
> between the opinion and the record as a whole; (5) whether or not the physician is
> a specialist in the area upon which an opinion is rendered; and (6) other factors
> brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331.  In applying these factors, "an ALJ must 'give good reasons in the notice of

determination or decision' for the weight [s]he ultimatel[y] assign[s] the opinion."  *Watkins*, 350

F.3d at 1300 (*quoting* 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5;

*Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).  Without these findings, remand is

required.  *Watkins*, 350 F.3d at 1300-01; *accord Krauser*, 638 F.3d at 1330.  Lastly, if the ALJ

rejects the opinion entirely, she must give "specific, legitimate reasons" for doing so.  *Watkins*,

350 F.3d at 1301.

Plaintiff contends that the ALJ erred by improperly rejecting the opinion of Dr. Jarmul,

Plaintiff's primary care physician from April 15, 2008 to February 19, 2009.  [AR. Doc. # 12-7,

2-46].  In addition to Dr. Jarmul's treatment notes, Dr. Jarmul provided her opinion as to

Plaintiff's condition in a worksheet, titled Functional Capacity Questionnaire (Physical 1.0),

dated June 19, 2009. [*Id.* at 61]. In the worksheet, Dr. Jarmul concluded that Plaintiff could

stand/walk a total of two hours in an eight-hour work day, and could sit a total of four hours in

an eight-hour work day. [*Id.*] She did not provide any restrictions as to Plaintiff's ability to lift

or carry any amount of weight, nor any restrictions on Plaintiff's fine motor skills. [*Id.*] Dr.

Jarmul indicated that in a typical work day Plaintiff's gout would frequently interfere with his

attention and concentration, and that Plaintiff had some symptoms of impaired sleep. [*Id.*] Dr.

Jarmul also indicated that Plaintiff's condition had not lasted, and was not expected to last at

least 12 months. [*Id.*]

       In determining that Dr. Jarmul's opinions were not entitled to controlling weight, the ALJ

explained that Dr. Jarmul's opinions as to Plaintiff's limitations in the worksheet were not well-

supported by the record as a whole, were from a brief period of time prior to the onset date, and

were inconsistent with other substantial evidence in the record, including SCFM's treatment

notes. [*Id.* at 12-2, 26]. The ALJ's determination at this step was proper. *See Hackett v.*

*Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005) (holding that if a treating physician's opinion is

inconsistent with other substantial evidence in the record it is not entitled to controlling weight).

       The ALJ then moved to the second step of the analysis and provided the weight to be

given to Dr. Jarmul's opinions in her examination records and the worksheet. In determining

that Dr. Jarmul's opinions in the worksheet were not entitled significant weight, the ALJ cited

two of the factors from 20 C.F.R. § 404.1527(c): Dr. Jarmul's opinions were based upon isolated

visits in a limited time of treatment prior to Plaintiff's alleged onset date, and Dr. Jarmul's

opinions were not consistent with the other substantial evidence, including examination records

from SCFM, (AR Doc. # 12-2, 24-26). *See* 20 C.F.R. §§ 404.1527(c)(2)(treatment relationship),

404.1527(c)(4)(consistency).  In regards to Dr. Jarmul's treatment relationship, the ALJ pointed

out that Dr. Jarmul only saw Plaintiff on "isolated incidents" that were approximately five

months prior to Plaintiff's onset date.  [AR Doc. # 12-2, 26].  The ALJ also provided two

examples of inconsistency: first, Dr. Jarmul's worksheet was inconsistent with the treatment

notes from SCFM, which provided that Plaintiff was "overall feeling good," and was a "highly-

motivated individual"; and second, Dr. Jarmul's restrictions were inconsistent with Plaintiff's

daily activities including weight lifting, use of an exercise bike, and exercise of at least 30

minutes each day.  [*Id*. at 24-26].

        The ALJ also discussed Dr. Jarmul's opinions in her examination records.  [*Id.* at 12-2,

25-26].  Among the records considered by the ALJ were Dr. Jarmul's treatment notes from April

15, 2008 through February 19, 2009.  [*Id.* at 12-7, 2-46].  The ALJ pointed out that throughout

these notes that Dr. Jarmul had repeatedly noted that after Plaintiff's single acute gout flare in

late January/early February 2009, Plaintiff did not have another gout flare.  [*Id.*] Additionally,

Dr. Jarmul's worksheet provided that Plaintiff's condition had not lasted, and was not expected

to last at least 12 months.  [*Id.* at 12-7, 61].  Dr. Jarmul's treatment notes also provided that Dr.

Jarmul had "completed short-term disability forms" for Plaintiff.  [*Id.* at 5]

        Based on a review of the record, I find that the ALJ did not err when she gave Dr.

Jarmul's opinions little weight.  The ALJ properly noted the limited relationship between Dr.

Jarmul and Plaintiff, and the fact that Plaintiff's last visit with Dr. Jarmul was approximately five

months prior to Plaintiff's alleged onset date.  The standing, walking, and sitting limitations

provided in Dr. Jarmul's worksheet are inconsistent with Plaintiff's activities, as provided in the

treatment notes from SCFM, which state that Plaintiff was engaged in strenuous exercise.  [*Id.* at

92-105].  Additionally, the ALJ's findings are in line with Dr. Bruce Lippman II's consultative

examination findings, which the ALJ gave great weight.  [*See id.* at 58-60].

Thus, the ALJ appropriately gave less weight to Dr. Jarmul's opinions that Plaintiff was

unable to work inasmuch as it was inconsistent with Plaintiff's testimony and the contradictory

medical evidence found in the treatment records by SCFM.  *See Plummer v. Apfel*, 186 F.3d at

429 (recognizing that a practitioner's opinion may be rejected if there is contradictory medical

evidence); 20 C.F.R. § 404.1527(d)(3) (specifying that the "more a medical source presents

relevant evidence to support an opinion, . . . the more weight we will give that opinion").

Accordingly, I find no error in the ALJ's decision to give Dr. Jarmul's opinions little

weight, *see Watkins*, 350 F.3d at 1301, which is supported by substantial evidence in the record.

## C.    ALJ's Step Five Analysis

At Step Five of the sequential evaluation procedure the ALJ must decide whether the

claimant can perform any other gainful and substantial work that exists in the national economy.

20 C.F.R. § 404.1520(g).  The Commissioner has the burden at Step Five of showing that the

claimant is capable of performing such work.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

This determination is made on the basis of the claimant's age, education, work experience, and

RFC.  20 C.F.R. § 404.1520(g)(1); *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

Plaintiff argues that the ALJ erred in Step Five of the disability analysis by improperly

relying on the vocational expert's ("VE") testimony.  Specifically, Plaintiff contends that the

VE's testimony regarding the jobs Plaintiff could perform was inconsistent with Plaintiff's RFC.

Plaintiff also argues that during the relevant period Plaintiff's change in age category mandated a

finding of disability under Grid Rule 201.06.  Lastly, Plaintiff argues that the VE's testimony

was inconsistent with the occupational information supplied by the Dictionary of Occupational

Titles ("DOT").

### 1.      VE' testimony & Plaintiff's RFC

SSR 00-4p states that before relying on VE evidence to support a disability determination

or decision, an ALJ must identify and obtain a reasonable explanation for any conflicts between

occupational evidence provided by vocational experts and information in the Dictionary of

Occupational Titles ("DOT") (including its companion publication, the Selected Characteristics

of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO)), and explain in

the decision how any conflict that has been identified was resolved.  2000 WL 1898704 at *1.  In

making disability determinations, the Commissioner will rely primarily on the DOT for

information about the requirements of work.  Occupational evidence provided by a VE should be

consistent with the occupational information supplied by the DOT.  When there is an apparent

unresolved conflict between the VE evidence and the DOT, the ALJ must elicit a reasonable

explanation for the conflict before relying on the VE evidence to support a decision about

whether a claimant is disabled.  At the hearing level, as part of the ALJ's duty to fully develop

the record, the ALJ will inquire, on the record, as to whether or not there is such consistency.  If

a conflict exists, the ALJ must resolve the conflict by determining if the explanation given by the

VE is reasonable and provides a basis for relying on the VE testimony rather than on the DOT

information.  2000 WL 1898704 at *2.

Here, the VE identified three jobs that plaintiff could perform given the RFC findings of

the ALJ.  [*See* AR Doc. # 12-2, 27028].  The ALJ adopted the opinions of the VE in finding that

Plaintiff could perform other work that exists in significant numbers in the national economy.

[*Id.*]

The ALJ's RFC findings for Plaintiff stated that Plaintiff needed to be limited to work with the following limitations:

> [Plaintiff] could lift or carry ten pounds frequently and twenty pounds occasionally; could stand and/or walk, with normal breaks, for a total of two hours in an eight hour workday; could sit, with normal breaks, for a total of six hours in an eight hour workday; could perform pushing and pulling motions with his bilateral upper extremities within the aforementioned weight restrictions but should avoid pushing and pulling with his bilateral lower extremities; should avoid unprotected heights and moving machinery; could occasionally perform the postural activities of climbing, stooping, crouching, kneeling, and crawling; should not climb ladders, ropes or scaffolds and should avoid repetitive bending and squatting.

[AR. Doc. 12-2-, 24]. Plaintiff argues that all three jobs identified require activity outside of the ALJ's defined limitations. I disagree.

The VE testified that with the limitations set forth by the ALJ, Plaintiff could perform the following positions: gate guard; furniture rental clerk; and telemarketer. [*Id.*] The DOT describes the position of gate guard as follows:

> Guards entrance gate of industrial plant and grounds, warehouse, or other property to control traffic to and from buildings and grounds: Opens gate to allow entrance or exit of employees, truckers, and authorized visitors. Checks credentials or approved roster before admitting anyone. Issues passes at own discretion or on instructions from superiors. Directs visitors and truckers to various parts of grounds or buildings. Inspects outgoing traffic to prevent unauthorized removal of company property or products. May record number of trucks or other carriers entering and leaving. May perform maintenance duties, such as mowing lawns and sweeping gate areas. May require permits from employees for tools or materials taken from premises. May supervise use of time clocks for recording arrival and departure of employees [TIMEKEEPER (clerical) 215.362-022]. May answer telephone and transfer calls when switchboard is

closed. When stationed at entrance to restricted area, such as explosives shed or research laboratory, may be designated Controlled-Area Checker (any industry).

DOT 372.667-030, 1991 WL 673099.  The DOT describes the position of furniture rental clerk

(consultant) as follows:

> Rents furniture and accessories to customers: Talks to customer to determine furniture preferences and requirements. Guides or accompanies customer through showroom, answers questions, and advises customer on compatibility of various styles and colors of furniture items. Compiles list of customer-selected items. Computes rental fee, explains rental terms, and presents list to customer for approval. Prepares order form and lease agreement, explains terms of lease to customer, and obtains customer signature. Obtains credit information from customer. Forwards forms to credit office for verification of customer credit status and approval of order. Collects initial payment from customer. Contacts customers to encourage followup transactions. May visit commercial customer site to solicit rental contracts, or review floor plans of new construction and suggest suitable furnishings. May sell furniture or accessories [SALESPERSON, FURNITURE (retail trade) 270.357-030].

DOT 295.357-018, 1991 WL 672589.  The DOT describes the position of telemarketer as

follows:

> Solicits orders for merchandise or services over telephone: Calls prospective customers to explain type of service or merchandise offered. Quotes prices and tries to persuade customer to buy, using prepared sales talk. Records names, addresses, purchases, and reactions of prospects solicited. Refers orders to other workers for filling. Keys data from order card into computer, using keyboard. May develop lists of prospects from city and telephone directories. May type report on sales activities. May contact DRIVER, SALES ROUTE (retail trade; wholesale tr.) 292.353-010 to arrange delivery of merchandise.

DOT 299.357-014, 1991 WL 672624.

By quoting language from the SCO describing general occupational areas like security

services (gate guard) and customer services (furniture rental clerk), Plaintiff attempts to argue

that these three positions involve activities prohibited by the ALJ's RFC.  [*See* Doc. # 19, pp. 26-

28].  Specifically, Plaintiff alleges that the following activities are prohibited by the ALJ's RFC:

23

the SCO's description of "security services" includes "reacting quickly in emergencies," and "keeping physically fit"; and the SCO's description of "customer services" includes "standing and walking for extended periods."  However, none of these descriptions are found in the DOT's descriptions of the actual positions provided by the VE, and defined in the DOT's definitions (provided above).  Further, at least two the activities Plaintiff alleges are prohibited by the ALJ's RFC are not actually prohibited.

The court will not reweigh the evidence or substitute its judgment for that of the Commissioner.  *Hackett*, 395 F.3d at 1173; *White*, 287 F.3d at 905, 908, 909.  The ALJ can rely on the testimony of the VE which is based on her professional experience.  *Rogers v. Astrue*, 2009 WL 368386 at *4 (10th Cir., Feb.17, 2009).  Here, the VE testified that the Plaintiff could perform these jobs given the RFC findings of the ALJ, including the limitations that Plaintiff could stand and/or walk for a total of two hours a day.  Plaintiff does not point to any actual evidence indicating the contrary.  In the absence of any evidence that these jobs require activity prohibited by the ALJ's RFC, I find no error in the ALJ's reliance on the VE testimony that Plaintiff can perform the jobs identified in light of all the limitations set forth by the ALJ.

### 2.      Application of Grid Rule 201.06

Plaintiff argues that the ALJ erred by not applying Grid Rule 201.06.  He submits that because he turned 51 during the relevant time period, the ALJ was required to apply Grid Rule 201.06, and as the telemarketing positions recommended by the VE was a sedentary position, a finding of disability was required.  I disagree for the following reasons.

If a claimant makes a showing of disability preventing him from engaging in prior work activity, the burden shifts to the Commissioner to show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy.   *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).   The Commissioner can often meet this burden by relying on the Medical Vocational Guidelines, 20 C.F.R. § 404, Subpt. P, App. 2 (the "Grid Rules").   *Frey*, 816 F.2d at 512.

> The grids consider a claimant's [RFC] to perform work (e.g., sedentary, light, medium or heavy) in relation to age, education, and work experience.  A series of rules then set forth presumptions of disability or no disability, depending upon whether there are significant numbers of jobs in the national economy that a claimant with that particular configuration of characteristics can perform. When the claimant's individual characteristics as found by the ALJ coincide with one of the specific rules, that rule "directs a conclusion as to whether the individual is or is not disabled."

*Id.* (internal citations omitted).

Grid Rule 201.06 applies if (1) the claimant is limited to sedentary work; (2) is of "advanced age;" (3) has a high school education or more but that does not provide for direct entry into skilled work; and (4) has previous work experience with skilled or semi-skilled jobs but those skills are not transferable.  *See* Grid Rule 201.06, 20 C.F.R. § 404, Subpt. P, App. 2 § 201.14.

Plaintiff contends that because he turned 51 during the relevant time period, and because the telemarketer position provided by the VE was a sedentary position, Grid Rule 201.06 mandates a finding of disability.  Plaintiff is incorrect for two reasons.  First, Plaintiff, even at age 51, was not of "advanced age" as defined by the Grid Rules.  *See* 20 C.F.R. pt. 404, subpt. P, app 2 (defining "advanced age" as "55 and over").  Instead, at age 51, Plaintiff would be

categorized as "approaching advanced age." *Id.* (this is a category which under a different Grid Rule also often mandates a finding of disability when a claimant is limited to only sedentary work). Second, Plaintiff, in the category of "approaching advanced age," was not limited to only sedentary work. While the VE did provide that Plaintiff would be able to perform the telemarketing work, a sedentary position, the VE also provided that the Plaintiff could perform work as a gate guard and furniture rental consultant, both light work positions. These positions were all in line with the ALJ's RFC findings that Plaintiff could perform light work with provided limitations. Thus, Plaintiff was not limited to sedentary work, and as such, Plaintiff's argument fails.

### 3.  VE's Testimony & the DOT

Finally, Plaintiff argues that the VE's testimony was inconsistent with the DOT, but does not allege any actual inconsistency. Thus, I find that the ALJ did not err by relying on the VE's statement that her testimony was consistent with the DOT. *See Rogers v. Astrue*, 2009 WL 368386 at *4 (10th Cir., Feb.17, 2009) (explaining that the ALJ can rely on the testimony of the VE which is based on his/her professional experience).

Accordingly, I find that the ALJ's Step 5 determination was proper.

## VII.  CONCLUSION

For the foregoing reasons, I AFFIRM the Commissioner's final order.

Dated: December   23  , 2013, in Denver, Colorado.

BY THE COURT

   s/Lewis T. Babcock

LEWIS T. BABCOCK, JUDGE

27